UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

JOSEPH SMITH,                                           :        CIVIL CASE NO.  18-CV-3443
                                                        :
            Plaintiff,                                  :
                                                        :
                                                        :
      -against-                                         :        COMPLAINT
                                                        :
                                                        :
BROOKHAVEN SCIENCE ASSOCIATES, LLC d/b/a                :        PLAINTIFF DEMANDS A
BROOKHAVEN NATIONAL LABORATORY, AND                     :        TRIAL BY JURY
INTERNATIONAL BROTHERHOOD OF                            :
ELECTRICAL WORKERS - LOCAL 2230,                        :
                                                        :
            Defendant(s).                               :

------------------------------------------------------------------- X

Plaintiff, Joseph Smith, by his attorney Brendan Chao, for his Complaint against

defendants, Brookhaven Science Associates, LLC d/b/a Brookhaven National Laboratory,

("BNL"), and the International Brotherhood of Electrical Workers ("IBEW") - Local 2230

("Local 2230"), alleges as follows:

## JURISDICTION AND VENUE

1.      This action is maintained pursuant to 39 U.S.C. § 1208 based upon a

violation of the collective bargaining agreement entered into between the defendants in this action,

and defendant Local 2230's failure to fairly represent plaintiff.

2.      Jurisdiction is specifically conferred upon this United States District Court

by the aforementioned statue, as well as 28 U.S.C. § 1331.

3.      Venue is based upon the fact that all or substantial part of the acts and

omissions giving rise to the claim occurred with the Eastern District of New York.

## THE PARTIES

4.      Plaintiff Joseph Smith ("Plaintiff" or "Mr. Smith") was employed by

defendants from 2006 to 2017, when his employment was terminated by defendants.  Plaintiff

resides in Setauket, New York.

5.      At all relevant times herein, plaintiff was an "employee" of defendant

BNL within the meaning of the applicable statutes.

6.      At all relevant times herein, defendant BNL was an "employer" within the

meaning of the applicable statutes.  Defendant BNL's principal executive office is located at 400

Center Street, Bldg. 490, Upton, N.Y., 11973-5000.

7.      At all times hereinafter mentioned, defendant Local 2230 is, upon

information and belief, the union for individuals employed by defendant BNL as electrical

workers, with a principal office at 3650 Route 112, Suite 102 Coram, N.Y. 11727.

## FACTS

8.      Plaintiff was employed by defendants from September 20, 2006 to

December 27, 2017.  Throughout this time he was also a member of Local 2230 of the IBEW.

9.      A collective bargaining agreement reciting the benefits and rights to

electrical workers was entered into between defendants Local 2230 and BNL, and was in effect

during all of the events which gave rise to the instant litigation.

10.     Plaintiff was hired by defendant BNL as an Air Conditioning ("A/C")

Mechanic.

11.     Among the responsibilities of an A/C Mechanic are installation,

maintenance, and repairs/adjustments to A/C and HVAC units.

12.     Defendant BNL employs about 3,000 people, including management. There were approximately twenty-seven (27) A/C Mechanics and three (3) supervisors ("Lead Men").

13.     In or about 2016, plaintiff's direct supervisor, Jon Marsicano, was fired and Joe Lovetro ("Mr. Lovetro") became his supervisor.

14.     On or about December 8, 2017, Mr. Lovetro called each A/C Mechanic individually to say that they would be having a meeting that day with Tom Daniels ("Mr. Daniels") the Facilities and Operations Manager at 4:00pm.

15.     During the meeting Mr. Daniels told the assembled workers that two anonymous letters were received by the Human Resources Department ("HR"). Allegedly, the anonymous complaints were made by A/C Mechanics concerning other A/C Mechanics.

16.     Mr. Daniels continued to say that the letters were about drugs, violence, and threats in the workplace. He said that they would investigate to see if this was a real threat, and that they had hired an outside consulting firm to conduct an investigation.

17.     On or about December 11, 2017, the outside consulting firm began interviewing the A/C Mechanics.

18.     On or about December 12, 2017, plaintiff was interviewed. The investigator asked him about Mr. Cohen, an A/C Mechanic coworker of plaintiff. Plaintiff told the investigator that people in the A/C department were saying Mr. Cohen was abusing drugs for years, but that he did not believe the allegations as he worked closely with Mr. Cohen and never observed illicit drug use.

19.     The investigator also asked plaintiff if Mr. Lovetro was a good boss and a good mechanic.  Plaintiff told the investigator that he was good boss, and that even though he was new to the position he understood A/C and HVAC mechanics.

20.     The investigator asked plaintiff if he was sure about this last statement and asked if he had ever had a problem with Mr. Lovetro or heard anyone make threats in the workplace.

21.     Plaintiff told the investigator that he never had a problem with Mr. Lovetro and never heard threats made in the workplace.

22.     On or about December 19, 2017, plaintiff was in a morning meeting when Tom Roza ("Mr. Roza") Manager of Production Division, entered the room with Tony Jones ("Mr. Jones") the head of HR, and Leonard Butera ("Mr. Butera") Manager of the Security Division.  They told plaintiff to go with them to Mr. Roza's office.

23.     Plaintiff went with them, and as they were on their way to Mr. Roza's office they began to aggressively search plaintiff.  They found a pocket knife that plaintiff carried in his pocket as a tool for work.  They also took his access security badge.

24.     When they arrived at Mr. Roza's office, there were two security guards waiting outside in the hallway and Frank Raynor ("Mr. Raynor") President of the Union, was sitting inside.  He told plaintiff that he was not sure what was going on and that he was just told to be there at 7:30am.

25.     Mr. Jones began questioning plaintiff.  He said that four or five men in the A/C shop said he made threats of violence.  He continued his questioning and asked plaintiff if

4

he had threatened to "cut someone's throat," and whether he ever said that "liars should be crucified."

26.     Plaintiff flatly denied making such statements.

27.     Mr. Jones continued asking if plaintiff said he carries a "sharp knife." Plaintiff told him he has never made a threatening statement to anyone. That he does carry a pocket knife, and he uses it as a tool on the job. Plaintiff told Mr. Jones that everyone carries a knife.

28.     Mr. Jones and Mr. Butera both told plaintiff "No, that's a weapon. You are carrying a weapon and threatening people with your sharp knife."

29.     Mr. Jones told plaintiff he was suspended pending further investigation.

30.     As the meeting took place, plaintiff's union representative, Mr. Raynor, did not say a word.

31.     Mr. Butera said they were going to search plaintiff's car, and he told them "No problem."

32.     Mr. Jones asked him, "Are we going to find anything in the car? Plaintiff replied "Nothing."

33.     Mr. Raynor drove plaintiff to where his car was parked. On the way there plaintiff remembered that he had a knife in his truck that was a gift to one of the BNL electricians, and that it was still in the box it was delivered in. Plaintiff told this to Mr. Raynor.

34.     Mr. Raynor told plaintiff that he better tell the security guards about the knife, which he did.

35.     They searched his car and found the small survival knife he had purchased as a gift.  It was still in the box it came in as he had told them.

36.     After the search ended, Mr. Raynor told plaintiff that he had seen this happen before and that he should just find another job.  Plaintiff asked him "Why are you writing me off?"  "I haven't been fired yet."

37.     Plaintiff told Mr. Raynor that he wanted to go to his locker because he was still in work clothes and wanted to change.  Plaintiff was taken to his locker by Mr. Raynor, Mr. Roza, Mr. Jones, and the two security guards.

38.     Plaintiff took his things and got dressed.  He was escorted out to the gate by the two security guards.

39.     About a week passed, and plaintiff contacted Mr. Raynor to see how the investigation was going.  Mr. Raynor told him that it was still ongoing.

40.     On or about December 27, 2017, Mr. Daniels, the Facility and Operations Manager, called plaintiff and left a message saying he was fired.

41.     Plaintiff called Mr. Raynor and told him he had been fired.  Mr. Raynor said they were going to go through the grievance process and that it would take time.  He also told him that the union's lawyer was getting more information from BNL on why plaintiff was fired.

42.     Mr. Raynor said that BNL had refused to give him information the first time he had asked because the outside consulting firm had yet to conclude their investigation.

43.     On or about January 9, 2018, New Life HR Solutions, LLC, the consulting firm brought in by BNL to investigate the anonymous complaints, wrote a twenty-one page

6

"Report and Investigation" (the "Report") purporting to "determine overall status of the department, morale, supervision received and behaviors within the department that could violate one or more multiple policies."

44.   The Report summarized interviews with numerous employees, but did not draw any conclusions, or make any recommendations based on its "investigation."

45.   The report was finalized and submitted to BNL approximately two weeks after plaintiff's termination of employment.

46.   Local 2230 filed a Step 3 grievance on behalf of plaintiff, which was denied by BNL on or about February 9, 2018.

47.   Plaintiff, however, never received such notification, and spoke to Mr. Raynor about the status of his grievance on or about February 16, 2018.

48.   Mr. Raynor sent plaintiff notification of this denial, and Local 2230's decision not to pursue arbitration.

49.   On or about February 28, 2018, plaintiff received copies of the Local 2230's letter dated February 20, and BNL's letter dated February 9.  This was the first time plaintiff saw that his grievance was denied, and that Local 2230 was not pursuing arbitration on his behalf.

50.   On or about April 10, 2018, counsel for plaintiff notified BNL's counsel that plaintiff intended to pursue arbitration pursuant to Step 4 of the Collective Bargaining Agreement's Grievance Procedure.

51.   Specifically, plaintiff alleged that the Collective Bargaining Agreement's Article XII (12.02) Termination by Discharge: "The laboratory shall not have the right to

discharge an employee except for just and reasonable cause.  Such discharge shall be the subject

of the grievance procedure....The parties will expedite arbitrations over discharges."

       52.      Plaintiff submits that his discharge was neither just nor reasonable.

       53.      In response to this request, counsel for BNL responded that plaintiff's time

to request arbitration expired sixty (60) days after BNL's Step 3 grievance determination, i.e.

February 9, 2018.

       54.      Plaintiff disputes defendant BNL's calculation of the expiration of sixty

days, and submits he timely filed his request to arbitrate his dispute within the time frame

proscribed by the Collective Bargaining Agreement.

       55.      In addition, the Collective Bargaining Agreement's Grievance Procedure

(12.01 a.) explicitly reserves the right for an individual worker to pursue his own grievance:

> "Nothing in the grievance procedures contained in this Contract shall be constructed or applied so as to abridge or limit in any way any right of any individual or individuals to present grievances to and adjust the same with the appropriate representatives of the Laboratory...."

## FOR A FIRST CAUSE OF ACTION FOR BREACH OF THE
## COLLECTIVE BARGAINING AGREEMENT

       56.      Plaintiff repeats and realleges the allegations contained in paragraphs 1

through 55 as if separately set forth herein.

       57.      Defendant BNL hired a consulting company to conduct a sham

investigation whose final Report was submitted to BNL two weeks after plaintiff's termination of

employment.

58.     Upon information and belief defendant BNL used the investigation as the justification to terminate plaintiff's employment.

59.     The Report contained nothing more than a summary of the interviews conducted by the consulting firm, and drew no conclusions and offered no recommendations following its "investigation."

60.     Plaintiff timely notified defendant BNL of his desire to arbitrate his grievance.

61.     Defendant BNL knowingly and willfully violated Article XII (12.02) Termination by Discharge of the Collective Bargaining Agreement by terminating plaintiff's employment without just and reasonable cause, and failing to arbitrate his dispute.

## FOR A SECOND CAUSE OF ACTION FOR
## BREACH OF DUTY OF FAIR REPRESENTATION

62.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 61 as if separately set forth herein.

63.     Plaintiff was entitled to representation by the union (Local 2230), which was capable of filing an arbitration grievance pursuant to the Collective Bargaining Agreement.

64.     Plaintiff contacted Local 2230 to request they file arbitration on his behalf.

65.     Local 2230 denied his request based upon its "internal review [that] led us to the conclusion that the laboratory had just cause to terminate your employment." Local 2230 further determined "not to pursue this grievance to arbitration as it lacks merit and is not in the best interest of Local 2230."

66.     Local 2230 further prejudiced plaintiff's rights when it failed to give timely notice of BNL's Step 3 decision.

67.     Notwithstanding provisions in the collective bargaining agreement to the contrary, defendant Local 2230 arbitrarily refused to file a grievance on plaintiff's behalf and in doing so breached the duty of fair representation by acting in bad faith.

WHEREFORE, while reserving the right to seek additional damages as available, plaintiffs demand judgment against defendant as follows:

A.     On the First and Second Causes of Action, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, as well as attorneys' fees, costs, and interest, all in amounts to be determined at trial;

B.     Such other and further relief as this Court deems just and proper.


Dated: June 13, 2018
        Rockville Centre, N.Y.




                                        BRENDAN CHAO
                                        Attorney & Counsellor at Law


                        By:     _____
                                        Brendan Chao (BC8811)

                                        Attorney for Plaintiff
                                        50 Merrick Road, Suite 200
                                        Rockville Center, N.Y. 11570
                                        (516) 466-2033


10