UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X

JOSEPH SMITH,                                        :         18 cv 03443 (SJF)(ARL)
                                                     :
                              Plaintiff,             :
                                                     :
                                                     :
        -against-                                    :         FIRST AMENDED
                                                     :         COMPLAINT
                                                     :
BROOKHAVEN SCIENCE ASSOCIATES, LLC d/b/a             :
BROOKHAVEN NATIONAL LABORATORY,                      :         PLAINTIFF DEMANDS A
INTERNATIONAL BROTHERHOOD OF                         :         TRIAL BY JURY
ELECTRICAL WORKERS - LOCAL 2230, JOSEPH              :
PAGANO, JOSEPH S. TRIOLO, JR., CHRIS J.              :
TSCHINKEL, CHRIS G. LUONI, AND MICHAEL J.            :
KEATING,                                             :
                                                     :
                              Defendant(s).          :
----------------------------------------------------------------- X

Plaintiff, Joseph Smith, by his attorney Brendan Chao, for his First Amended

Complaint against defendants, Brookhaven Science Associates, LLC d/b/a Brookhaven National

Laboratory, ("BNL"), and the International Brotherhood of Electrical Workers ("IBEW") - Local

2230 (the "Local ) (hereinafter collectively referred to as the "Union"), Joseph Pagano, Joseph S.

Triolo, Jr., Chris M. Tschinkel, Chris G. Luoni, and Michael J. Keating alleges as follows:

JURISDICTION AND VENUE

1.      This action is maintained pursuant to the Labor Management Relations Act,

29 U.S.C. §185(a) ("Section 301"), and the National Labor Relations Act, 29 U.S.C. §151 et seq.

based upon a violation of the Collective Bargaining Agreement ("CBA") entered into between

defendants BNL and the Union in this action, and defendant Union's failure to fairly represent

plaintiff.

2.      Jurisdiction is specifically conferred upon this United States District Court

by the aforementioned statutes, as well as 28 U.S.C. § 1331.

3.      Venue is based upon the fact that all or substantial part of the acts and omissions giving rise to the claim occurred with the Eastern District of New York.

## THE PARTIES

4.      Plaintiff Joseph Smith ("plaintiff" or "Smith") was employed by defendants from 2006 to 2017, when his employment was terminated by defendants.  Plaintiff resides in Setauket, New York.

5.      At all relevant times herein, plaintiff was an "employee" of defendant BNL within the meaning of the applicable statutes.

6.      At all relevant times herein, defendant BNL was an "employer" within the meaning of the applicable statutes.  Defendant BNL's principal executive office is located at 400 Center Street, Bldg. 490, Upton, N.Y., 11973-5000.

7.      At all times hereinafter mentioned, defendant Union, upon information and belief, is the union for individuals employed by defendant BNL as electrical workers, with a principal office at 3650 Route 112, Suite 102 Coram, N.Y. 11727.

8.      At all times hereinafter mentioned, defendant Joseph Pagano ("Pagano") was an employee of defendant BNL, and is, upon information and belief, a resident and citizen of New York State.

9.      At all times hereinafter mentioned, defendant Joseph S. Triolo, Jr. ("Triolo") was an employee of defendant BNL, and is, upon information and belief, a resident and citizen of New York State.

10.     At all times hereinafter mentioned, defendant Chris J. Tschinkel ("Tschinkel") was an employee of defendant BNL, and is, upon information and belief, a resident and citizen of New York State.

11.     At all times hereinafter mentioned, defendant Christ G. Luoni ("Luoni") was an employee of defendant BNL, and is, upon information and belief, a resident and citizen of New York State.

12.     At all times hereinafter mentioned, defendant Michael J. Keating ("Keating") was an employee of defendant BNL, and is, upon information and belief, a resident and citizen of New York State.

## FACTS

13.     Plaintiff was employed by defendant BNL from September 20, 2006 to December 27, 2017.  Throughout this time he was also a member of the defendant Union.

14.     Plaintiff was hired by defendant BNL as an Air Conditioning ("A/C") mechanic.

15.     Among the responsibilities of an A/C Mechanic are installation, maintenance, and repairs/adjustments to A/C units.

16.     Defendant BNL employs about 3,000 people, including management. There were approximately twenty-seven (27) A/C mechanics and three (3) supervisors ("Lead Men").

17.     A CBA reciting the benefits and rights afforded electrical workers was entered into between defendants Union and BNL, and was in effect during all of the events which gave rise to plaintiff's claims.

3

18.     Until his suspension and termination of employment in December 2016, plaintiff was never disciplined for misconduct, or any other work-related discrepancies as an employee of defendant BNL.

19.     During all relevant times, the Union's Executive Board ("E Board") was made up of Frank Raynor ("Raynor"), Joseph Pagano ("Pagano"), Steven Strelecki ("Strelecki"), Dan Galligan ("Galligan"), John Berry ("Berry"), Tom Brooksbancks, and Bob Hougsteder.

20.     The Union's E Board was responsible for representing its Union members in enforcing, among other things, the CBA, and filing grievances on behalf of the Union members, including plaintiff.

21.     Defendant BNL keeps track of its employees' time by punch clock.

22.     Over the years, theft of time from defendant BNL by some of its workers occurred.  In the instances when BNL discovered the theft the perpetrators were summarily fired.

23.     Defendant BNL, however, did not implement the penalty for theft of time violations evenly.

24.     For example, shortly before plaintiff's termination from BNL, a number of Union members were suspected of time theft; the time theft involved electricians leaving work early and falsifying their time cards.  An investigation ensued, and it was determined that the theft occurred over approximately one year.

25.     Included in the employees accused of time theft were Raynor and Strelecki.  At that time, both Raynor and Strelecki were members of the Union's E Board.

26.     Following the investigation, Raynor and Strelecki were not fired.  Instead, they received letters of warning to their files, and nothing more.

4

27.     Following this lenient disciplinary action, the Union's E Board agreed to withdraw twenty five (25) pending grievances it had against defendant BNL.

28.     Defendant Pagano had a very cozy relationship with defendant BNL's management, especially Leo Somma ("Somma").

29.     Somma was the senior manager at the complex, and he directed that Pagano do no work other than "Union business" exclusively.  Somma instructed Pagano's supervisor, Joe Lovetro ("Lovetro"), not to assign any work to Pagano because he was to work only on "Union business."

30.     Defendant Pagano, throughout his time as a member of the Union's E Board, actively participated in a side business of performing electrical work on company time.

31.     Defendant Pagano took parts for jobs needed for his side business from defendant BNL's parts inventory.

32.     Defendant BNL was aware of defendant Pagano's side business despite the work being done on company time.

33.     Defendant Pagano's obligations to the Union were compromised in exchange for special treatment from defendant BNL, including ensuring his day consisted of nothing more than "working on Union business," and permitting his side work to continue on company time.

34.     The Union E Board's independence and integrity was/is compromised by several members' self dealing with defendant BNL, and caused them to fail to pursue arbitration on behalf of plaintiff for his wrongful termination of employment.

5

35.     On or about December 8, 2017, Lovetro called each A/C Mechanic individually to say that they would be having a meeting that day with Tom Daniels ("Daniels") the Facilities and Operations Manager.

36.     During the meeting Daniels told the assembled workers that two anonymous letters were received by the Human Resources Department ("HR").  Allegedly, the anonymous complaints were made by A/C mechanics concerning other A/C mechanics.

37.     Daniels went on to say that the letters were about drugs, violence, and threats in the workplace.  He said that BNL would investigate to see if this was a real threat, and that they had hired an outside consulting firm to conduct an investigation.

38.     On or about December 11, 2017, the outside consulting firm, New Life HR Solutions LLC, ("New Life") began interviewing the A/C mechanics; the interviews were conducted by Jennifer Rivas ("Rivas").

39.     On or about December 12, 2017, plaintiff was interviewed.  The investigator asked him about an A/C mechanic coworker of plaintiff.  Plaintiff told the investigator that people in the A/C department were saying the A/C mechanic was abusing drugs for years, but that he did not believe the allegations as he worked closely with the individual, and never observed illicit drug use.

40.     The investigator asked plaintiff if he had ever had a problem with his supervisor, Lovetro, or heard anyone make threats in the workplace.

41.     Plaintiff told the investigator that he never had a problem with Lovetro, and never heard threats made in the workplace.

42.     Rivas continued interviewing A/C mechanics, including defendants Pagano, Triolo, Tschinkel, Luoni, and Keating.

43.     These individual defendants gave statements to Rivas that they attributed to plaintiff including, but not limited to, "Liars should be nailed to the cross" "My knife is sharp." (Defendant Triolo); "What do we do with liars?  Liars should be nailed to the cross" "Liars should be taken care of." (Defendant Tschinkel); "My knife is sharp." "You touch me again and I'll filet you." "I'd like to stab him up close and personal so he knows I did it." (Defendant Keating); "Tattletales get stabbed.  My knife is sharp and it's got your name on it." (Defendant Pagano); "I want to stab Bob McKay in the jugular so I could be up close and personal to see him bleed out." (Defendant Luoni).

44.     The remaining nine (9) individuals who were interviewed, including plaintiff's supervisor, Lovetro, denied hearing the threats the individual defendants attributed to plaintiff.

45.     On or about December 19, 2017, plaintiff was in a morning meeting when Tom Roza ("Roza") Manager of Production Division, entered the room with Tony Jones (**"Jones"**) the head of HR, and Leonard Butera ("Butera") Manager of the Security Division. They told plaintiff to go with them to Roza's office.

46.     Plaintiff went with them, and as they were on their way to Roza's office they began to aggressively search plaintiff.  They found a pocket knife that plaintiff carried in his pocket as a tool for work.  They also took his access security badge.

47.     When they arrived at Roza's office, there were two security guards waiting outside in the hallway and plaintiff's Union representative, Raynor, was sitting inside.  He told plaintiff that he was not sure what was going on and that he was just told to be there at 7:30am.

48.     Jones began questioning plaintiff.  He said that four or five men in the A/C shop said he made threats of violence.  He continued his questioning and asked plaintiff if he had threatened to "cut someone's throat," and whether he ever said that "liars should be crucified."

49.     Plaintiff flatly denied making such statements.

50.     Jones continued asking if plaintiff said he carries a "sharp knife."  Plaintiff told him he has never made a threatening statement to anyone.  That he does carry a pocket knife, and he uses it as a tool on the job.  Plaintiff told Jones that everyone carries a knife.

51.     Jones and Butera both told plaintiff "No, that's a weapon.  You are carrying a weapon and threatening people with your sharp knife."

52.     Jones told plaintiff he was suspended pending further investigation.

53.     As the meeting took place, Raynor, the Union President, and plaintiff's union representative, remained silent.

54.     Butera said they were going to search plaintiff's car, and he told them "No problem."

55.     Jones asked him, "Are we going to find anything in the car?  Plaintiff replied "Nothing."

56.     Raynor drove plaintiff to where his car was parked.  On the way there plaintiff remembered that he had a knife in his truck that was a gift to one of the BNL electricians, and that it was still in the box it was delivered in.  Plaintiff told this to Raynor.

57.     Raynor told plaintiff that he better tell the security guards about the knife, which he did.

58.     They searched his car and found the small survival knife he had purchased as a gift.  It was still in the box it came in as he had told them.

59.     After the search ended, Raynor told plaintiff that he had seen this happen before and that he should just find another job.  Plaintiff asked him "Why are you writing me off?" "I haven't been fired."

60.     Plaintiff told Raynor that he wanted to go to his locker because he was still in work clothes and wanted to change.  Plaintiff was taken to his locker by Raynor, Roza, Jones, and the two security guards.

61.     Plaintiff took his things and got dressed.  He was escorted out to the gate by the two security guards.

62.     About a week passed, and plaintiff contacted Raynor to see how BNL's investigation was going.  Raynor told him that it was still ongoing.

63.     Raynor told plaintiff he intended to get copies of the anonymous letters and further investigate the allegations on his behalf, which he never did.

64.     On or about December 27, 2017, two days after Christmas, Daniels, the Facility and Operations Manager, called plaintiff and left a message saying he was fired.

65.     Plaintiff called Raynor and told him he had been fired.  Raynor said they were going to go through the grievance process, and that it would take time.

66.     Raynor said that BNL refused to give him additional information regarding the allegations against plaintiff.

67.     Plaintiff told Raynor that he wanted to speak to the union's lawyer and give the names of witnesses.  Raynor replied, "We don't do that.  The lawyer is only for consultation."

68.     Raynor told plaintiff that he would investigate the matter himself.

69.     Raynor did not get copies of the anonymous letters, and conducted no investigation on plaintiff's behalf.

70.     Several of plaintiff's co-workers (individual defendants herein) were on a mission to get several A/C mechanics fired, including plaintiff, and made up stories of drug use and violence in the workplace to get their way.

71.     Plaintiff had significant evidence that these allegations were false, and had a meritorious basis to defend himself in arbitration.

72.     Raynor and the E Board simply adopted defendant BNL's decision to terminate plaintiff's employment without speaking to any relevant witnesses, and never received copies of relevant documents in defendant BNL's possession that it allegedly used as the bases for plaintiff's termination of employment.

73.     On or about January 9, 2018, New Life, the consulting firm brought in by BNL to investigate the anonymous complaints, wrote a twenty-one page "Report and Investigation" (the "Report") purporting to "determine overall status of the department, morale, supervision received and behaviors within the department that could violate one or more multiple policies."

74.     The Report summarized interviews with numerous employees, but did not draw any conclusions, or make any recommendations based on its "investigation."

75.     Interestingly, at least one page of this report, the last page, is missing from the Report provided by defendant BNL to plaintiff at his unemployment hearing before the N.Y.S. Department of Labor.

76.     The last page is typically where an investigator's conclusions and recommendations would appear, but this page is missing.  Despite assurances from defendant BNL's in-house counsel that it would be provided it has not been disclosed.

77.     The Report was finalized and submitted to BNL approximately two weeks after plaintiff's termination of employment.

78.     On or about January 16, 2018, a third-step grievance meeting was held between defendants BNL and defendant Union.  The members of the Union's E Board who attended the meeting included Galligan, Raynor, Berry, Pagano and Strelecki.

79.     On or about February 9, 2018, defendant BNL denied plaintiff's grievance.

80.     On or about February 28, 2018, plaintiff received copies of the Union's letter dated February 20, and BNL's letter dated February 9.

81.     The Union's letter stated it was not pursuing arbitration on plaintiff's behalf.  This was the first time plaintiff saw that his grievance was denied, and that Union was not pursuing arbitration on his behalf.

82.     On or about April 10, 2018, counsel for plaintiff notified BNL's counsel that plaintiff intended to pursue arbitration pursuant to Step 4 of the Collective Bargaining Agreement's Grievance Procedure.

83.     Specifically, plaintiff alleged that the Collective Bargaining Agreement's Article XII (12.02) Termination by Discharge: "The laboratory shall not have the right to

11

discharge an employee except for just and reasonable cause.  Such discharge shall be the subject of the grievance procedure….The parties will expedite arbitrations over discharges."

84.    Plaintiff submits that his discharge was neither just nor reasonable, and told the Union of numerous witnesses who would contradict the individual defendants' false allegations against him; the Union chose not to conduct any investigation, and did not speak to any of his witnesses.

85.    Defendant BNL fired plaintiff before its own internal investigation was concluded, and ignored evidence elicited during the investigation which clearly controverted the supposed anonymous letters that led to the investigation in the first place.

86.    In addition, the CBA's Grievance Procedure 12.01 a. explicitly reserves the right for an individual worker to pursue his own grievance:

> "…When an employee, the Union or the Laboratory decides to pursue an issue through the grievance procedure, a grievance will be filed.  Nothing in the grievance procedures contained in this Contract shall be constructed or applied so as to abridge or limit in any way any right of any individual or individuals to present grievances to and adjust the same with the appropriate representatives of the Laboratory provided the appropriate representatives of the Union are given the opportunity to be present at such an adjustment." Id. (Emphasis added).

87.    Arbitration is Step 4 of the Grievance Procedure, and is identified as such in Section 12.01 c. Grievance Steps:

> "If a satisfactory settlement is not reached in the three steps provided above, and it involves…discharge of an employee…it may be submitted for arbitration…." Id.

12

## FOR A FIRST CAUSE OF ACTION FOR BREACH OF THE
## COLLECTIVE BARGAINING AGREEMENT

88.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 87 as if separately set forth herein.

89.     Defendant BNL hired a consulting company to conduct a sham investigation whose Report was submitted to BNL two weeks _after_ plaintiff's termination of employment.

90.     Upon information and belief, defendant BNL used the investigation as the justification to terminate plaintiff's employment.

91.     The Report contained nothing more than a summary of interviews conducted by the consulting firm, and drew no conclusions and offered no recommendations following its "investigation."

92.     Plaintiff timely notified defendant BNL of his desire to arbitrate his grievance.

93.     Defendant BNL knowingly and willfully violated Article XII (12.02) Termination by Discharge of the CBA by terminating plaintiff's employment without just and reasonable cause, and failing to arbitrate his dispute.

## FOR A SECOND CAUSE OF ACTION FOR
## BREACH OF DUTY OF FAIR REPRESENTATION

94.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 93 as if separately set forth herein.

95.     Plaintiff was entitled to fair representation by the Union, which was capable of filing an arbitration grievance pursuant to the CBA.

96.     Plaintiff had a meritorious basis to arbitrate his dispute.

97.     Plaintiff contacted the Union to request they file arbitration on his behalf.

98.     The Union denied his request based upon its "internal review [that] led us to the conclusion that the laboratory had just cause to terminate your employment."

99.     The Union conducted no investigation of its own into the allegations leveled against plaintiff, and did not speak to witnesses who would corroborate plaintiff's defense.

100.    The Union failed to obtain any documentation concerning the allegations made against plaintiff during its "investigation."

101.    In short, the Union adopted defendant BNL's findings as its own in deciding not to pursue arbitration on behalf of plaintiff in reckless disregard of his rights.

102.    The Union further prejudiced plaintiff's rights when it failed to give timely notice of BNL's Step 3 decision.

103.    Notwithstanding provisions in the CBA to the contrary, defendant Union arbitrarily refused to file a grievance on plaintiff's behalf and in doing so breached its duty of fair representation.

104.    In addition, defendant Union acted in bad faith when it chose not to pursue plaintiff's arbitration because a majority of the E Board's loyalty to the Union and its members was compromised by their acts of self dealing in exchange for self aggrandizement and protection from BNL.

14

## FOR A THIRD CAUSE OF
## ACTION FOR SLANDER

105.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 104 as if separately set forth herein.

106.    Defendants Pagano, Triolo, Tschinkel, Luoni, and Keating deliberately and with malice, or at a minimum, negligently, made false spoken statements to a third party, Rivas of New Life, which constituted fault, and caused special harm to plaintiff, namely the loss of his job.

107.    The spoken statements attributed to plaintiff include, but are not limited to: "Liars should be nailed to the cross" "My knife is sharp." (Defendant Triolo); "What do we do with liars?  Liars should be nailed to the cross" "Liars should be taken care of." (Defendant Tschinkel); "My knife is sharp." "You touch me again and I'll filet you." "I'd like to stab him up close and personal so he knows I did it." (Defendant Keating); "Tattletales get stabbed.  My knife is sharp and it's got your name on it." (Defendant Pagano); "I want to stab Bob McKay in the jugular so I could be up close and personal to see him bleed out." (Defendant Luoni).

108.    These statements were made to Rivas at a time, place, and manner known only to Rivas and defendants Pagano, Triolo, Tschinkel, Luoni, and Keating.

109.    Rivas transcribed her meetings with these defendants, but failed to note when and where the statements were made.

WHEREFORE, while reserving the right to seek additional damages as available, plaintiff demands judgment against defendants as follows:

A.      On the First and Second Causes of Action back pay and benefits and front

pay and benefits, plus compensatory and punitive damages, as well as attorneys' fees, costs, and interest, all in amounts to be determined at trial;

B.      On the Third Cause of Action compensatory and punitive damages, as well as attorneys' fees, costs, and interest, all in amounts to be determined at trial;

C.      Such other and further relief as this Court deems just and proper.


Dated: August 15, 2018
        Rockville Centre, N.Y.


                                BRENDAN CHAO
                                Attorney & Counsellor at Law

                        By: _____
                                Brendan Chao (BC8811)

                                Attorney for plaintiff
                                50 Merrick Road, Suite 200
                                Rockville Center, N.Y. 11570
                                (516) 466-2033


TO:     COLLERAN, O'HARA & MILLS LLP
        Attorneys for defendant IBEW Local 2230

        JACKSON LEWIS LLP
        Attorneys for defendant BNL

        JOSEPH PAGANO

        JOSEPH S. TRIOLO, JR.

        CHRIS J. TSCHINKEL

        CHRIS G. LUONI

        MICHAEL J. KEATING